(Hamilton County Court of Common Pleas.)

### THE TURNER BAU-VEREIN NO. 3 v. BERTHA DAHLHEIMER et al.

If a mortgagee, in taking a new mortgage to secure the same loan, expresses an intent to retain the lien of the prior mortgage, such intent controls, and the lien will be sustained as against intervening liens; if, in taking the new mortgage, he expresses an intent to rely on the lien of the new mortgage, such intent will control, and the lien of the prior mortgage is extinguished; if, in taking the new mortgage, he acts under a mistake of fact, as if he act in ignorance of an intervening lien, and no intent is expressed, it will be presumed that he did not intend to release his prior lien, and equity will sustain such prior lien.

The mortgagee may lose the lien of the prior mortgage if, after having acquired knowledge of the intervening lien, he clearly manifests an intention, by some act or word, of relinquishing or foregoing his rights under his prior mortgage.

SAYLER, J.

On or about October 24, 1889, the defendant, Bertha Dahlheimer, subscribed for twenty shares of the capital stock of the Harugari No. 3 Building & Savings Company, and on November 8th received $9,000, and on December 26, $1,000, the estimated value of such shares. For the purpose of securing the re-payment of the same, she executed a mortgage to said association on property designated as lots 1, 2 and 3, lying on the corner of Harvey and Hickman streets. This mortgage was dated November 8, 1889, and recorded in Vol. 574, p. 478, of Hamilton County Records, on November 8, 1889.

In this transaction Robert Kuehnert acted as the attorney of the building asociation and of the borrower.

The property covered by the mortgage had been appraised by the appraising committee of the association before the loan was made.

On March 6, 1890, Bertha Dahlheimer executed a mortgage on lot No. 3 to the Germania No. 5 Loan & Building Company to secure $5,000. This mortgage was recorded March 8, 1890.

In this transaction Robert Kuehnert acted as the attorney of the building association and of the borrower. As such attorney he reported the title clear.

On March 6, 1890, the Harugari association ordered the release of the lot 60 feet by 125 feet on the corner of said streets, being lot 2 as above designated, on the payment of $2,500. The money was paid, and on March 13, 1890, the president reported that the corner lot had been released. It appears, however, that the release entered on March 7, 1890, on the record, was for a lot 40 by 125 feet.

On June 3, 1890, Bertha Dahlheimer executed a mortgage on lot No. 1 to the New Germania Loan & Building Company to secure $5,000. This mortgage was recorded June 10, 1890.

In this transaction Robert Kuehnert acted as the attorney of the building association and of the borrower. As such attorney he reported the title clear.

After Mrs. Dahlheimer had paid the $2,500, she continued to pay dues on twenty shares, to the Harugari Association, and the attorney of the association, Mr. Kuehnert, reported to the association that she wished to take up the $10,000 mortgage and execute a $7,500 mortgage, so she could then pay dues on fifteen shares, and thereby reduce the amount of her payments. The association thereupon directed the said attorney to examine and report as to liens, and in compliance therewith he made a written report to the effect that the $10,000 mortgage still remained the first mortgage. In this written report no mention is made of subsequent liens.

Thereupon, on January 2, 1891, the said association resolved to cancel the $10,000 mortgage as soon as Bertha Dahlheimer pays the balance she owed under the same. On the same day the said association resolved to let Bertha Dahlheimer have $7,500 on the "old security," and to pay the same to her as soon as the association received twenty weeks dues, etc., in advance.

Thereupon, on or about the third day of January, 1891, Bertha Dahlheimer subscribed for fifteen shares of the capital stock of said association of the value of $7,500, and upon that day executed a mortgage to secure the repayment of the same on lots 1 and 3, and which mortgage was recorded January 8, 1891.

The accounts of the association under the $10,000 mortgage were kept under (pass book) No. 256. This account was closed on January 5, 1891, showing on that date an indebtedness of $6,880.60.

The amount of the fifteen new shares, $7,500, was applied by the association as follows:

| | | |
|---|---:|---:|
| Initiation, $1 per share.............................$ | 15 | 00 |
| Charged for pass book................................ | | 25 |
| Dues in advance on fifteen shares..   ..... ...... . | 150 | 00 |
| Interest in advance on fifteen shares.   ........   .. | 180 | 00 |
| Premiums in advance on fifteen shares..... ......... | 27 | 00 |
| Balance of old mortgage............... .......... | 6,880 | 60 |
| Cash paid to B. Dahlheimer by check to Robert Kuehner, her atorney ...... .. ... ............... | 247 | 16 |
| | $7,500 | 01 |

This amount, $6,880.60, was not paid to Bertha Dahlheimer under the $7,500 mortgage; nor was it paid by her to the association on the $10,000 mortgage in money.

She was charged on the books of the company with the full $7,500 under the last mortgage, and she was credited with $6,880.60 on the account kept under the $10,000 mortgage to settle that balance.

On the ledger account, under the $10,000 mortgage, pass book No. 256, the secretary made the entry giving credit of $6,880.60, which balanced the account, and thereupon made a memorandum on the account: "This loan is paid up and the mortgage cancelled."

The association kept a cash book, showing the nightly cash receipts. In order that these entries should correspond with the entries in the other books, an entry was made in this book on January 15, 1891, of $6,880.60, received on pass book 256; and opposite this entry the secretary entered a memorandum to the effect that the balance of the loan was paid and the mortgage cancelled.

A new account was thereupon opened on January 15, 1891, in the books of the association under pass book No. 282, and in which the pass book (Bertha Dahlheimer) was charged with the amount of the new loan, $7,500.

The $10,000 mortgage was cancelled on January 15, 1891, by the president and secretary of the association as paid in full.

It was a rule of the Harugari association to loan only on first mortgages.

It was also a rule to require an appraisement of the property upon all new loans.

When the $7,500 mortgage was taken, no appraisement was required. An appraisement had been made under the rules of the association when the $10,000 mortgage was taken, which was on file, and which was deemed by the directors to be sufficient for the $7,500 transaction.

The president of the Harugari testifies that he was present when Kuehnert's report as to the title was read; he says they ordered Kuehnert to report as to title, so as to know whether the property had been incumbered, and that they relied upon the report; that he thought the report was to the effect that the property was all clear, free and unincumbered; that they discussed the report, and the exchange of mortgages was granted only on condition that the new mortgage was to be the first mortgage.

There is other testimony, however, tending to show that one of the directors asked Mr. Kuehnert at the meeting whether there was any incumbrance on the property, and he said the $10,000 mortgage was the first and only mortgage.

The testimony is to the effect that Kuehnert, representing Mrs. Dahlheimer, requested the cancellation of the old mortgage and the execution of a new mortgage for the purpose of relieving her from the payment of dues on five shares of stock, and the testimony tends to show that the object could be obtained in no other way; but there is also testimony in the case tending to show that so long as the $10,000 mortgage stood, the association was required to pay dividends on twenty shares, and that it would be to the advantage of the association to have that mortgage cancelled and a new one taken for $7,500, and that this fact was taken in consideration in the transaction.

The directors of the Harugari testify that at the time the resolution was passed under which the $10,000 mortgage was cancelled, they did not know there were other mortgages on the property, and that they would not have voted to cancel the $10,000 mortgage had they known that there were other mortgages on the property.

I think the testimony clearly shows that at the time the $10,000 mortgage was ordered to be cancelled, the directors of the association were entirely satisfied from the report of Mr. Kuehnert, and his statement made in connection with it, that the property was clear, excepting the lien of their mortgage, and that therefore it was entirely safe for them to cancel the $10,000 mortgage; sell fifteen new shares to Mrs. Dahlheimer of the estimated value of $7,500, and take a new mortgage to secure the same, and, of that amount, apply $6,880.60 in payment of the balance of the old mortgage, and thereby relieve Mrs. Dahlheimer from payment of dues and the company from payment of dividends on five shares.

Being satisfied of these facts, fifteen new shares were sold to her, for which she paid one dollar per share for initiation; a new mortgage was taken to secure them; a new book was issued, for which she paid twenty-five cents; a new account was opened, charging her with $7,500; of that amount $6,880.60 was credited to her on the old account, and the old account was balanced and closed.

But it is clear that, had they known there were other liens, they would not have done so.

On or about the 31st day of December, 1891, the plaintiff, the Turner Bau Verein No. 3, and the Harugari No. 3 Building & Savings Company were consolidated under sec. 3835j of the Revised Statutes, under the name of the Turner Bau Verein No. 3, whereby the plaintiff became invested with all the rights both legal and equitable of the said Harugari association, and subject to its liabilities, and the members became members of the Turner, etc., association, and in pursuance thereof the said Harugari asociation transferred to the plaintiff the said $7,500 mortgage.

The new association had fifteen directors, four of whom had been directors of the Harugari at the time of the foregoing transactions, and certain of these four directors, if not all of them, while directors of the

Harugari, took part in the meetings of the association at which it was determined to cancel the $10,000 mortgage, and to take a new mortgage for $7,500.

Some time in December, 1892 Kuehnert left the city.  His abrupt departure led the directors of the Turner asociation to have the records of the property covered by the $7,500 mortgage examined by an attorney, and in the later part of that month such attorney reported to the association the existence of the said mortgages to the Germania No. 5 and the New Germania as being of record prior to the $7,500 mortgage.

The association thereupon ordered that a suit be brought against Kuehnert for damages growing out of the transaction, and that attachment be sued out against him on the ground of fraud.

Such suit was brought and an attachment levied on certain real estate and certain personal property.  Nothing was realized from the real estate; the personal property was sold and the proceeds, some $200, are in the hands of the sheriff.

Mrs. Dahlheimer, becoming in arrears for dues, this action was brought on February 23, 1893, under the direction of the directors, to foreclose the $7,500 mortgage; the trial was had and a decree taken on the same, all questions as to priorities being reserved.

The four directors who had been directors of the Harugari, or a portion of them were present at the meetings of the directors of the Turner association at which the existence of the mortgages to the Germania No. 5 and the New Germania was reported as of record prior to the $7,500; also at the meeting at which the attachment suit, and the suit to foreclose the $7,500 mortgage were ordered to be brought.  The books of the Harugari association, showing the $10,000 transaction, were then in the possession of the officers of the Turner association—the proper custodians.

The testimony also tends to show that the abrupt departure of Kuehnert caused the directors of the New Germania Loan & Building Company to have the records examined as to the property covered by their $5,000 Dahlheimer mortgage; that their attorney found their mortgage to be the first lien of record on the property, and so reported to the association, and that, therefore, the association took no further proceeding in the matter until this suit was brought, in which they were made defendants and filed their answer and cross-petition.

The testimony tends to show that at about the time of the trial of this case, the attorney of the association learned from a proceeding pending in court some of the facts in regard to the cancellation of the $10,000 mortgage; that thereupon, after the trial of this case, he went to the office of the Turner association and examined the books and found the accounts showing the nature of the transaction whereby the $10,000 mortgage was cancelled and the mortgage of $7,500 was taken.  The attorney made a report to the association, and the directors were of conflicting opinions as to what was advisable to be done, but as a result an amended petition was filed in the case, by which it is claimed that the lien of the association is paramount to the lien of the other mortgages, and asking that the amount due it be first paid out of the proceeds of the sale of the property, and, if necessary, that the former judgment be modified or vacated to conform to the facts in the amended petition. .

It is claimed by the plaintiff that the cancellation of the $10,000 mortgage was made through a mistake of fact; that it was not the intention to release the lien held by the association; that the subsequent mortgage for $7,500, so far as it secures the debt under the first mortgage, is a continuation of the original lien.

In 29 Ohio St. 240, in which the mortgagor had made a conveyance

of the property to an assignee of a senior mortgage, and the question was whether there was a merger, the court say, Ib. 243: "Where the intent to merge, or not to merge, is, with knowledge of the facts, expressly or unequivocally fixed and declared, the question is settled by such determination. But where there is no expressed intent, or the party is incapable of expressing any, the court looks into the circumstances and implies an intent upon the part of the owners of the two interests to keep the charge or incumbrance subsisting, where its subsistence is beneficial to him, and where there are no equitable circumstances which ought to require its extinguishment." In this case the court quotes from 16 Ohio St. 294. where Judge Welsh said, "a leading feature of the law is, that merger will never be presumed against the equities of the parties."

In 16 Ohio St. 556, 557, the court say: "Where equity requires it, and where the debtor does not actually intend to put an end to his rights under the security, there is no good reason for refusing him the benefit of the security technically extinguished by the payment, any more than there is for refusing him the benefit of collateral securities, which are not extinguished by the payment."

See also 34 Ohio St. 598; 38 Ohio St. 472.

In 35 Minn. 336, the court lays down the rule: "It is a familiar rule, that if the holder of a mortgage takes a new mortgage as a substitute for a former one, and cancel and release the latter in ignorance of an intervening lien upon the mortgaged premises, equity will, in the absence of some special disqualifying fact, restore the lien of the first mortgage. and give it its original priority."

The court holds in this case that a subsequent mortgagee who became such anterior to such discharge can not claim to be injured by setting aside the release and restoring the mortgagee to his rights.

The court holds further, that the fact that the mortgage was released in ignorance of the existence of the intervening lien, is deemed such a mistake of fact as to entitle the party to relief, and this, although such intervening lien was of record at the time. The court had a perfect right to infer that he would not have made this release had he known of these intervening liens, and a court of equity will grant relief on the ground of mistake, not only when the mistake is expressly proved, but also when it is fairly implied from the nature of the transaction.

I think these propositions are sustained in 69 Maine 499; also, in 31 N. J. Eq. 205, and in which case the court holds that "the question is one of intention," (Ib. 206), "nor can a security be considered released, or surrendered where no payment has been made, until some act or word of the creditor is proved, clearly manifesting an intention of relinquishing or foregoing his right." (Ib. 207) And citing authorities say: "These authorities render it perfectly clear that unless it has been satisfactorily shown that the defendant intended, by the acceptance of the last security, to give up the lien of her first, the first remains in full vigor."

In 14 Ill. 286, the mortgaged property was conveyed to the mortgagee, in satisfaction and discharge of the debt, and the mortgage was cancelled of record by the mortgagee, and then owner of the land, in ignorance of a pending judgment lien. The court say (Ib. 288): "At law the mortgage was clearly extinguished, the mortgagee accepted an absolute deed of the estate, and entered satisfaction of the judgment obtained on the note and mortgage. The debt was thus fully paid and the security discharged of record. The question now is, can the court of equity still regard the mortgage as an unsatisfied and subsisting incumbrance?"

The court holds it a question of intention: "The conclusion from all the authorities is that if a party acquires an estate upon which he has an

incumbrance, the incumbrance is, in equity, considered as subsisting, or extinguished, according to his intentions, expressed or implied. The intention is the controlling consideration, where it has been made known, or can be inferred from the acts and conduct of the party. * * * If no intention has been manifested, equity will consider the incumbrance as subsisting, or extinguished, as may be most conducive to the interest of the party. If no evidence of his intention appears, and it is a matter of indifference to him whether the incumbrance be kept alive or not, it is regarded as extingiushed."

By the deed the mortgagee obtained covenants of warranty of the mortgagor, and the relinquishment of the a dower interest in the lot.

The court held that it was the intention of the mortgagee to look to his deed, and not to his mortgage, for security, and refused to restore the lien.

This case is cited in 85 Ill. 124, and quoted so far as the question of intention, but distinguished so far as a case in which the mortgagor obtained the covenants of warranty and release of dower, and did not follow it.

In 100 Ill. 281, the mortgagee agreed to give an extension of time on the unpaid part of the debt, new notes and mortgage to be executed. A computation of the amount of the principal and interest due on the unpaid notes was made, and new notes were executed for the amount found due on such computation and a new mortgage was given. The old notes were surrendered and the old mortgage released of record by the mortgagee, in ignorance of a mortgage executed a short time prior thereto. On learning the facts, the mortgagee brought suit to reinstate the old mortgage. The court held that the taking of the new mortgage and entering satisfaction of the old mortgage was, as designed by the parties, but in continuation of the lien of the first mortgage. The court say (Ib. 285): "The transaction was entirely irrespective of Campbell. No consideration moved from him. It was with no reference to his benefit, and should not be made to redound thereto by the advancement of his mortgage to a priority over the lien of Trotter for the unpaid portion of the purchase money for this land he sold to Wright. The entry of satisfaction of the first mortgage and surrender of the first notes was but a formality, as regarding any essential right of the parties; but it gives to Campbell's mortgage an equitable advantage which it ought not to enjoy. It was through ignorance, in fact, of the existence of Campbells' mortgage, that Trotter entered satisfaction of the first mortgage and surrendered the notes, and which he would not have done had he known of Campbell's mortagge. This Trotter testifies to, and the nature of the transaction itself would satisfy one that such must have been the case."

The court held that 14 Ill. 286, did not apply, although, in this case, the mortgagee got interest on the accrued interest on the old note. The court held he was entitled to accrued interest (Ib. 286).

In 35 Iowa, 157, and in 73 Iowa, 555, the court sustains the same doctrine, although the new mortgages were given to secure the amount of the old mortgages and an additional sum in each case.

In 101 Mass. 426, in which the release of the old mortgage (for purchase money) and the making of the new one appeared to be parts of one transaction only, the court held that no estate of homestead was acquired by the mortgagor as against the mortgagee.

In 61 Ind. 56, the rights of a person purchasing after the cancellation was entered of record were involved.

In 73 Ind. 425, the court citing 101 Mass. 426; 13 Cal. 526, and other cases, held that the taking of a new note and mortgage by the mortgagor

for the same debt, upon the same lands, will not discharge the lien of the first mortgage, but the lien will be continued in the new mortgage. On the trial of that case the court had charged that "if the second debt was created by the parties getting together and having a settlement of mutual running accounts, and other debts, among which was the first mortgage debt, and a balance is found due the plaintiff, this balance being put in a note and mortgage, that would form a new consideration, and the lien of the first mortgage would be divested; or, if, at the time the second mortgage was taken, it was the agreement and understanding that it was to be in full payment and satisfaction of the first mortgage, that would operate as a cancellation of the first mortgage. And the court say this is a correct statement of the law.

In 109 Ind. 37, the court, citing many authorities, but not 73 Ind. 425, say that "courts will keep alive an encumbrance when equity requires it, and it was not the intention of the parties that the incumbrance should be extinguished. (Ib. 40.)

In 64 N. Y. 397, the purchaser of land subject to a mortgage, in ignorance of a judgment lien against a prior owner, paid off the mortgage. The court held that he was entitled to be subrogated to the rights of the morgagee, and restored the mortgage lien as prior to the lien of the judgment.

In the 13 Cal. 526, an unmarried man executed a mortgage; he subsequently married, and then executed a mortgage to a party who paid off the first mortgage on its being released; the wife did not sign the mortgage; the court held that in equity the transaction is an assignment of the first mortgage, that it is not creating a new incumbrance, but simply changing the form of the old.

It would seem, under these authorities, that the rights of the parties are to be determined by the intent of the mortgagee. If the mortgagee in taking the new mortgage expresses an intent to retain the lien of the prior mortgage, such intent controls, and the lien will be sustained as against intervening liens; if in taking a new mortgage he expresses an intent to rely on the lien of such new mortgage, such intent will control, and the lien of the old mortgage is extinguished; if, in taking a new mortgage, he acts under a mistake of fact, as if he act in ignorance of an intervening lien, and no intent is expressed, it will be presumed that he did not intend to release his prior lien, and equity will sustain such lien.

In the case at bar, I think the directors of the Harugari association, in releasing the $10,000 mortgage and taking the $7,500 mortgage, acted under a mistake of fact—they did not know of the existence of the intervening mortgages; that their intention, as to whether they would rely on the new mortgage or retain the lien under the old mortgage, was not expressed, either by act or word.

It seems to me, therefore, in equity, the lien of the association under the $10,000 mortgage to the extent of the balance owing under it, would be sustained, notwithstanding the cancellation of that mortgage, and the taking of the new mortgage.

It is claimed that the books show a settlement of running accounts was had, an that therefore this case comes within the exception to the rule laid down in 73 Ind. 425. But I do not think that the closing of the books of the association was a settlement of running accounts such as is contemplated in that case.

In 100 Ill. 281 supra, there was a computation of the principal and interest due on unpaid notes; and it seems to me that the closing of the books, instead of being a settlement of running accounts, was a determination of the amount due on the mortgage.

It is further claimed that as the evidence tends to show the building association would save dividends by taking a new mortgage, the case comes within the perview of 14 Ill. 286 supra. It was claimed in 100 Ill. 281, that as the mortgagee obtained interest on accrued interest, that case was controlled by the 14 Ill.; but the court rejected such proposition, holding that the mortgagee was entitled to such interest. On the same principle it seems to me this case does not come within the perview of 14 Ill.

It is claimed that the entries made on the books of the company to the effect that the balance of the $10,000 loan was paid, and the mortgage cancelled, show the intent. These entries were no more formal than the cancellation; they were all made under a mistake of fact and controlled by the same principle. A book entry is not conclusive (4 Ohio St. 67).

It is claimed that the decree of foreclosure taken in this case is conclusive. I think a mistake of fact may be corrected in a case of this kind, even against a decree.

In 128 Ind. 59, a suit had been brought on a lien containing a mistake and a decree in foreclosre taken. The holder, discovering the mistake, commenced a new proceeding. The court held that he was not precluded by the judgment rendered in the former case from again foreclosing his lien. See also 4 Ohio St. 209; 6 Ohio St. 459.

It is claimed that the release of record of only forty feet of the sixty foot lot on the payment of the $2,500, was prejudicial to the defendants. I can not see how it can be. The association agreed to release the sixty feet, it was bound to do so, and should have done so. It could yet be called on to do so. The association has no claim on the remaining twenty feet; it has released it; only the release of the same is not of record.

At the time Kuehnert left the city suddenly and an investigation was made, and the intervening mortgages discovered, and reported to the directors of the Turner association, as of record prior to its $7,500 mortgage, four of its directors, who had been directors of the Harugari and took part in the transaction of cancelling the $10,000 mortgage and taking the $7,500, knew the facts in regard to the transaction. These four directors acted for the Harugari with the other directors in that transaction. The Harugari and the Turner having been consolidated, that transaction became a part of the affairs of the present association, the plaintiff.

There is no testimony tending to show that either of these four directors imparted their knowledge to their co-directors; but where a director acts for the corporation for the transaction of the business in respect to which it is sought to charge it with notice, as where he, as one of the board of directors, authorizes the discount of a note procured by fraud, of which he had notice, the bank would be bound as though his knowledge had been communicated to the entire board. 121 Mass. 490; see also Wade on the Law of Notice, sec. 682, 683a. 1 Hill 572; 2 Hill 463.

It seems to me that the knowledge of these four directors, who acted in the transaction by which one mortgage was substituted for another, and who were then acting in the matter, was the knowledge of the entire board.

At that time the books of the Harugari, showing the entire transaction, were in the possession of the directors of the plaintiff.

The directors of the plaintiff, with this knowledge as to the existence of the intervening mortgages, directed that a suit be brought against Kuehnert for damages growing out of the transaction and had an attachment issued on the ground of fraud, under which they seized and hold some property. Subsequently, when Mrs. Dahlheimer became in default

for dues, they ordered that a suit be brought to foreclose the $7,500 mortgage, and such suit was brought and prosecuted to a decree.

I take it that the directors of the Turner Association, in office at the time the attachment and foreclosure suits were ordered, were successors to the directors of the Harugari Association; that is, that there was one continuous board of directors, and of which four who were directors of the Harugari, remained directors under the consolidation.

These acts of the plaintiff would seem to come within the perview of acts referred to in 31 N. J. Eq. 207 supra, where the court say the security will not be released "until some act or word of the creditor is proved, clearly manifesting an intention of relinquishing or foregoing his right."

After much hesitation, I have come to the conclusion that the directors should be held to have had knowledge of the nature of the transaction whereby the $10,000 mortgage was cancelled, at the time they directed the attachment and foreclosure suits; they then did know of the intervening mortgages; and that by their acts, with such knowledge, they declared their intent to rely on the lien of the $7,500. As it is a question of intent, and as they expressed their intent and acted on it, their right in equity under the lien of the $10,000 mortgage ceased to exist; they can not now recall it.

But, further, I think it was incumbent on the plaintiff, on learning of the intervening mortgages, to investigate the matter as to its rights, and to act with due diligence in asserting its lien under the prior mortgage. Aside from implied knowledge, it had possession of the books containing all the information as to the $10,000 transaction; it had therefore the means of information in its possession.

The testimony tends to show that one of the other mortgagees, having had the records examined, and supposing it held the first lien, took no further steps in the matter. What steps could have been taken is not apparent. Kuehnert had reported to both of the other associations that the title to the property was clear, free and uncumbered at the time the $10,000 mortgage was on the property. They had their right of action against him, if the $10,000 mortgage was a subsisting lien; but if the $10,000 mortgage was cancelled, they were not damaged. They had the right to know whether the plaintiff claimed any right under that $10,000 mortgage.

I think the lien of the claim of the plaintiff should date from the time of the record of the $7,500 mortgage.

Wm. L. Dickson, for the New Germania; Goebel & Betinger, for the Germania; John W. Warrington, John Boutet, Fred Closs, Jr., Louis R. Luebbert and J. J. Gasser, for plaintiff..